# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MIKE HOOKS DREDGING CO., INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO:   08-3945** |
| **ECKSTEIN MARINE SERVICE, INC. ET AL** | **SECTION: "C" (1)** |

## ORDER & REASONS

This matter was tried on the issue of liability before the Court, without a jury, on August 22-24, 2011, and taken under advisement on November 18, 2011.  Having considered the evidence and the testimony adduced at trial, the record, the post-trial and other memoranda of counsel, and the law, the Court now issues its opinion.

## I. BACKGROUND

Around 9:15 a.m. on May 31, 2008, the M/V PAT MCDANIEL and its tow of six barges ("PAT MCDANIEL"), owned and operated by Eckstein Marine Service, Inc. ("Eckstein")[1], struck the Dredge MIKE HOOKS ("Dredge" or "MIKE HOOKS") and the Dredge's tender NICOLAS and welding barge, owned and operated by Mike Hooks Dredging Co., Inc. ("Hooks"), on the Gulf Intracoastal Waterway ("ICW") near the intersection of Wax Lake Outlet and the ICW ("Wax Lake intersection").[2]  Between May 29 and May 31, before the PAT MCDANIEL casualty, the Dredge

---

[1] Eckstein is now known as Marquette Transportation Company Gulf-Inland, LLC.

[2] Hooks also sued Memco Barge Line, LLC ("Memco"), owner of four of the PAT MCDANIEL's six barges, namely SARAH E 203, LTD 113 B, MEM 2160, and MBL 971, as well as Ingram Barge Company ("Ingram"), owner of two of the PAT MCDANIEL's six barges, namely

was lightly hit by the WALTER CENAC around mile 99, and almost hit, twice, by two different vessels, while it was in the Wax Lake outlet. Additionally, five hours before it was struck by the PAT MCDANIEL, it was struck by the SARAH D and tow, a vessel owned and operated by C & J Marine Services, Inc. ("C & J").[3] (Tr. 55, 83). The parties dispute the significance of the Dredge's location during each of these incidents, including the incident with the PAT MCDANIEL. Specifically, Hooks argues that because the Dredge was in the middle of the channel during the two near misses and the accident with the SARAH D, while during the accident with the PAT MCDANIEL, it was moored on a bank, with its spuds down, stationary, and unable to move, that the earlier incidents are in essence irrelevant. In contrast, Eckstein argues that the Dredge was in the channel, at approximately the same location, during all of the incidents, hence, the earlier accidents and near misses are relevant. The parties agree, however, that Eckstein was traveling westbound when it hit the Dredge, that the Wax Lake intersection has dangerous currents and eddies, that on the day of the accident the currents and eddies were stronger than usual because it was high water season, and that the individuals involved in the accident knew this was the case.

Hooks entered into a contract ("Hooks/Corps contract") with the United States Army Corps of Engineers ("Corps") that required Hooks to provide a picket boat to assist it in its dredging operations. As a result, Hooks asked Longman's Marine Service, Inc. ("Longman's") to locate a

---

IB 1010 and IB 981. This Court dismissed the claims against Memco and Ingram. (Rec. Doc. 152). Moreover, Hooks sued the PAT MCDANIEL and all of its six barges *in rem*, claiming that the vessel and barges were within the jurisdiction of this Court. (Rec. Doc. 1 at ¶¶ IV, VIII). These *in rem* claims were included in the Pre-Trial Order. (Rec. Doc. 284 at 27). However, no evidence was presented showing that the PAT MCDANIEL or any of its six barges were seized or were in fact in this district at the time the suit was filed. *See Chase v. Wetzlar*, 225 U.S. 79, 88 (1912); 13F Fed. Prac. & Proc. Juris. § 3633 (3d ed. 2011). Accordingly, Hooks's *in rem* claims against the PAT MCDANIEL, and barges SARAH E 203, LTD 113 B, MEM 2160, MBL 97, IB 1010 and IB 981, are dismissed.

[3]Hooks has settled its claims against C & J. (Rec. Doc. 102).

picket boat, and through a series of intermediaries, the request was ultimately referred to Tommie

Vizier Towing Company, Inc. ("Vizier"). Hooks then hired the CAP'N TOMMIE VIZIER JR.

("picket boat"), owned and operated by Vizier, to serve as the picket boat. No one disputes that

Vizier did not physically assist the PAT MCDANIEL in passing the MIKE HOOKS at the time of

the incident, though the parties disagree over the legal consequences of this fact.

Hooks filed suit against Eckstein under Rule 9 of the Federal Rules of Civil Procedure and

28 U.S.C. § 1333, alleging that Eckstein was fully at fault for the accident and in violation of

multiple Inland Navigational Rules ("INRs")[4], namely INR 2, 33 U.S.C. § 2002, INR 5, 33 U.S.C.

§ 2005, INR 6, 33 U.S.C. § 2006, INR 7, 33 U.S.C. § 2007, INR 8, 33 U.S.C. § 2008, INR 9, 33

U.S.C. § 2009, INR 18, 33 U.S.C. § 2018, and INR 34, 33 U.S.C. § 2034. Eckstein argues that

Hooks was solely at fault for the accident because it violated the Rivers and Harbors Act, 46 U.S.C.

§ 409 and 33 C.F.R. § 64.06, INR 9, the Radio Telephone Act, 33 U.S.C. § 1204, and 33 C.F.R. §

162.75(b)(3)(I), and because it breached the Hooks/Corps contract. Eckstein also made third party

claims pursuant to Federal Rule of Civil Procedure 14(c), arguing in the alternative that Vizier's

and/or Longman's is or are responsible for all of Hooks's claims against Eckstein.[5] (Rec. Docs. 80,

---

[4]None of the parties dispute that the INRs, 33 U.S.C. § 2001 *et seq.*, apply.

[5]Eckstein initially made a breach of contract claim directly against Vizier and Longman's, on the theory that it was a third party beneficiary to the Hooks/Corps contract. However, the Court held that Eckstein was not a third party beneficiary to the Hooks/Corps contract, and thus dismissed all claims by Eckstein against Vizier and Longman's for breach of that contract. (Rec. Doc. 268). Accordingly, Eckstein's remaining claims against Vizier and Longman's are for their liability to Hooks only.

In addition, Eckstein made *in rem* third party claims against CAP'N TOMMIE JR, owned by Vizier. (Rec. Doc. 80 at ¶ XXII). These *in rem* claims were not in the Pre-Trial Order. (Rec. Doc. 284). Furthermore, no evidence was presented showing the CAP'N TOMMIE JR were seized or were in fact in this district at the time the suit was filed. Accordingly, Eckstein's *in rem* claims against the CAP'N TOMMIE JR are dismissed.

56).  In particular, Eckstein claims that Vizier is liable to Hooks for negligence, breach of contract, and breach of warranty of workmanlike performance.  Eckstein claims that Longman's is liable to Hooks for breach of contract and breach of warranty of workmanlike performance.[6]

## II. FINDINGS of FACT and CONCLUSIONS OF LAW

The Court heard testimony from ten witnesses: (1) for Hooks: John Darby, leverman (dredge operator) on the MIKE HOOKS, Ricky Domengue, a captain of the MIKE HOOKS, and Michael Marshall, Hooks's navigational expert; (2) for Hooks and Eckstein: Stephen Williamson, captain of the PAT MCDANIEL employed by Eckstein; and (3) for Eckstein, Gary Cowick, surveyor and civil engineer employed by Hooks, Steven Zar, Jr., captain of the SARAH D employed by C & J, Johnny Hebert, captain of the CAP'N TOMMIE VIZIER JR. employed by Vizier, Jarrod Longman, sole owner of Longman's,  Joseph E. Valantour, senior construction representative for the Corps, and David Scruton, Eckstein's navigational expert.[7]  Based on the testimony of these witnesses, and

---

[6]Eckstein initially claimed that Longman's, and not just Vizier, was negligent toward Hooks, (Rec. Doc. 56 at ¶ XVI), but it has since dropped that claim by not including it in the Pretrial Order and affirmatively voluntarily dismissing the claim.  (Rec. Doc. 284 at 15, Rec. Doc. 320 at 13, Rec. Doc. 322 at 26).


[7]At trial, the Court found that Marshall was a qualified expert in the field of vessel and towboat operations and as a master mariner.  (Tr. 204-205).  The Court now finds that he is qualified to testify as an expert regarding picket boat operations, even though the qualification is based on his experience in observing picket boat operations as opposed to any formal training he received.  (Tr. 205).  Federal Rule of Evidence 702 establishes the standard for expert witness qualification, requiring that such witnesses must be qualified by virtue of their "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Whether or not a person is qualified may be based on just one of these five.  *See Lavespere v. Niagra Mach & Tool Works*, 910 F.2d 167, 176 (5th Cir. 1990), cert. denied, 510 U.S. 859 (1995), abrogated on other grounds, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994); *see also* 29 Fed. Prac. & Proc. Evid. § 6265 (1st ed. 2011).
As to Eckstein's expert, Scruton, Hooks argues that is not qualified because he does not have a U.S. Coast Guard license.  However, Scruton has over 40 years of experience in the maritime

the numerous exhibits and depositions received at trial, the Court makes the following findings of fact and conclusions of law.

### A. <u>Fault Under Maritime Law</u>

Mike Hooks argues that Eckstein was fully at fault for the collision. Eckstein argues that Mike Hooks was solely at fault for the accident, or alternatively, that Tommie Vizier and/or Longman's is or are responsible for all of Mike Hooks's claims against Eckstein.

To establish a claim for negligence under the general maritime law, the plaintiff (or the third party plaintiff, such as Eckstein in this case) must prove "that there was a duty owed by the defendant to plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Canal Barge Company, Inc. v. Torco Oil Company*, 220 F.3d 370, 376 (5th Cir. 2000). The existence and scope of a duty under the general maritime law turns primarily on "the foreseeability of the harm suffered by the complaining party." *Consolidated Aluminum Corporation v. C.F. Bean Corporation*, 833 F.2d 65, 67 (5th Cir. 1987).

District courts have considerable discretion in assigning comparative fault. Analyzing all the evidence presented, it comes to a conclusion based upon the number and quality of the faults of each party, and the part they played in causing the casualty. *See, e.g., United Overseas Export Lines, Inc. v. Medluck Compania Maviera*, 785 F.2d 1320, 1326 (5th Cir. 1986) (affirming district court's sixty-five percent/ thirty-five percent apportionment of fault); *Gele v. Wilson*, 616 F.2d 146,

---

business, including in the areas of marine operation, safety navigation, and rules of the road. (Tr. 614-616). Thus, for the same reason as for Marshall, the Court also finds that Scruton is qualified as an expert in those areas.

148 (5th Cir. 1980) ("the calibration of culpability is simply not susceptible to any real precision.").

Two maritime law presumptions are relevant in this case. The *Oregon* creates a presumption of liability; the *Pennsylvania* creates a presumption of causation. Each rule is discussed in turn. Under the *Oregon* rule, when a moving vessel strikes a stationary vessel, the moving vessel is presumed to be at fault. *The Oregon*, 158 U.S. 186 (1895); *Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790 (5th Cir. 1977), *cert. denied*, 435 U.S. 924 (1978). The *Oregon* rule shifts not only the burden of production, but also the burden of persuasion, from the plaintiff to the defendant. *Bunge*, 558 F.2d at 795, note 3 ("Cases in this Circuit . . . establish that this presumption affects the burden of proof, not merely the burden of going forward with the evidence.") (citing *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724 (5th Cir. 1967)). "The burden is heavily upon the vessel asserting [a defense of unavoidable accident]." *Brown*, 377 F.2d at 726. The moving vessel "'must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.'" *Boudoin v. Ray McDermott & Co.*, 281 F.2d 81, 88 (5th Cir. 1960) (quoting *The Hylas*, 1925 A.M.C. 921, 925 (L. Hand, J.)). The moving vessel may rebut the presumption only by proving that the allision was the fault of the stationary object or that the allision was an unavoidable accident. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 503 (5th Cir. 1994).

There is no dispute that the PAT MCDANIEL was moving at the time of the accident. Eckstein argues that the MIKE HOOKS was effectively, if not actually, moving, and thus that the accident is best characterized as a "collision" whereby two moving vessels ran into one another. In contrast, Mike Hooks argues that the MIKE HOOKS was stationary, and thus that the incident was an allision, whereby a moving vessel ran into a stationary vessel.

The Court finds that the Dredge was stationary and could not move at the time of the

accident. Joseph Valantour, a representative of the Corps, which is not a party to the instant litigation, testified that on the morning of May 31, 2008, before the incident occurred, the Dredge was "already against the bank." (Tr. 592). Furthermore, Valantour agreed that "the dredge was spudded down absolutely stationary" as the PAT MCDANIEL was coming toward it. (Tr. 598). In addition, on cross-examination at trial, Stephen Williamson, captain of the PAT MCDANIEL and employee of Eckstein, stated that he "really didn't know if he had his spuds down or not," (Tr. 147) but in his deposition testimony, he agreed that, before the accident, the Dredge "had his spuds down, and [the Dredge] was out of the channel." (Ex. 45 at 30). This deposition testimony is admissible under Federal Rule of Civil Procedure 32(a)(2) because it was used by Mike Hooks to impeach Williamson at trial.[8] (Tr. 148). Even if Williamson was not certain that the Dredge's spuds were down, his deposition testimony suggests that he subjectively believed that they were, and thus that

---

[8]In its Reply to the Trial Briefs, Eckstein argues that the Court should ignore Hooks's references to Williamson's deposition testimony that do not fall under one of the exceptions in Federal Rule of Civil Procedure 32(a). Rule 32(a) states:
    (a) Using Depositions
        (1) In General. At a hearing or trial, all or part of a deposition may be used against a party on these conditions:
            (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
            (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
            (C) the use is allowed by Rule 32(a)(2) through (8).
Fed. R. Civ. P. 32(a).

    Eckstein states that "none of the Rule 32 exceptions apply" but provides no support for its argument that Hooks's use of the deposition testimony does not fall under Rule 32(a)(2). (Rec. Doc. 322 at 5). That Rule states: "[a]ny party may use a deposition to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence." Fed. R. Civ. P. 32(a)(2). Eckstein adds that Hooks may not "ignore a full day of trial testimony by Williamson," but provides no authority for this statement. (Rec. Doc. 322 at 5). Accordingly, where the deposition testimony relied upon by either party falls under that exception, the Court may consider it.

he believed that the Dredge was anchored or somehow fixed.[9]

Eckstein further argues that following the accident with the SARAH D, the MIKE HOOKS failed to change its "day shape" as required under the Hooks/Corps contract to indicate that it was no longer dredging and had restricted maneuverability due to the accident. (Rec. Doc. 320 at 4-5, Rec. Doc. 322 at 18, note 51). The Hooks/Corps contract required that "Navigation lights and day signals" to be "displayed at all times." (Ex. 30 at 2). Additionally, the Hooks leverman, John Darby, who was in charge of changing the day shapes to reflect that the Dredge was disabled or undergoing repairs, testified that he did not make any changes to any of the day shapes after the MIKE HOOKS was struck by the SARAH D. (Tr. 26). Darby agreed that this meant there would be no indication from the day shapes that the Dredge was in a compromising position. (Tr. 26). Therefore, the Court finds that Hooks failed to comply with its contractual duty to show proper day shapes. However, this finding does not change the fact that Williamson believed the Dredge was stationary. It is appropriate to apply the *Oregon* presumption where the party against whom it is applied was aware of the presence of the stationary object. *Brunet*, 15 F.3d at 503 ("As [pilot of the defendant owner of moving vessel] was aware of the [stationary object's] presence, it was appropriate to erect the presumption of fault against [defendant].").  Therefore, the Court is convinced that the incident between the MIKE HOOKS and the PAT MCDANIEL was an allision, not a collision, and the *Oregon* presumption applies unless the PAT MCDANIEL rebuts the presumption by proving that the MIKE HOOKS was fully or partly responsible for the allision. *Brunet*, 15 F.3d at 503. As discussed below, the Court concludes that Eckstein rebuts the *Oregon*

_____

[9]Furthermore, Eckstein appears to admit that the Dredge was stationary. For instance, it states in the Pretrial Order that certain statements "document the improvident decision to spud down in a narrow channel[]." (Rec. Doc. 284 at 13).

presumption because it proved by a preponderance of the evidence that Hooks violated INR 9 and the Hooks/Corps contract, and that such negligence contributed to Hooks's damages. Accordingly, the *Oregon* presumption does not apply.

The *Pennsylvania* rule shifts the burden of proof as to causation. *Green v. Crow*, 243 F.2d 401, 403 (5th Cir. 1957). It applies to statutory violations, of which Hooks and Eckstein accuse one another, and of which Vizier accuses Eckstein in defense of Eckstein's third party negligence claim against it. "This rule provides that when a ship violates a statutory rule of navigation intended to prevent collisions, 'the burden rests on the ship of showing not merely that the fault might not have been one of the causes, or that it probably was not, but that it could not have been.'" *Otto Candies, Inc. v. M/V Madelaine D*, 721 F.2d 1034, 1036 (5th Cir. 1983) (quoting *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873). "Where both parties to a collision are guilty of statutory fault, the heavy presumption that the fault of each contributed to the accident may be rebutted by proof that, in fact, the fault of either of the parties was the sole cause of the accident or, instead, not a substantial contributing cause thereof. *Otto Candies*, 721 F.2d at 1036. If neither party is exonerated, the Court must determine the proportionate degree of fault of both parties. *Otto Candies*, 721 F.2d at 1036 (citing *Florida East Coast Railway Company v. Revilo Corporation*, 637 F.3d 1060, 1067 (5th Cir. 1957); *see United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975) (adopting proportional fault theory of liability).

## B. Mike Hooks's Claims Against Eckstein

### 1. Hooks's Alleged Fault

Eckstein argues that Hooks was at fault for the accident because (a) it was an obstruction,

in violation of the Rivers and Harbors Act, 46 U.S.C. § 409, 33 C.F.R. § 64.06, and the Hooks/Corps contract, (b) it violated INR Rule 9 and 33 C.F.R. § 162.75(b)(3)(i) by anchoring itself in a narrow channel, and (c) it breached other key aspects of the Corps/Hooks contract as well as the Radio Telephone Act, 33 U.S.C. § 1204.

Eckstein alleges that any breach of the Hooks/Corps contract constitutes a violation of the Rivers and Harbor Act, 33 U.S.C. § 403. That statute prohibits dredging operations unless they are permitted by the U.S. Army Corps of Engineers. *See United States v. King Fisher Marine Service*, 640 F.2d 522, 523 (5th Cir. 1981). The Fifth Circuit has held that 33 U.S.C. § 403 "is structured as a flat prohibition unless – the unless being the issuance of approval by the Corps." *Zabel v. Tabb*, 430 F.2d 199, 207 (5th Cir. 1970). Members of the MIKE HOOKS crew were aware that the contract was the reason the Dredge was permitted to dredge in the ICW. For instance, Ricky Domengue, captain on the MIKE HOOKS, agreed that "[t]he only thing that allows [Hooks] to go to Wax Lake at all is that contract" and that "if [Hooks] is not complying with that contract, [it] can't go to Wax Lake[.]" (Tr. 101). The *Pennsylvania* Rule applies to breaches of a permit issued by the Corps. *See Orange Beach Water, Sewer and Fire Protection Authority*, 680 F.2d 1374, 1383 (11th Cir. 1982) (citing *American Zinc Co. v. Foster*, 313 F. Supp. 671 (S.D. Miss. 1970), modified on other grounds, 441 F.2d 1100 (5th Cir. 1971), cert. denied, 404 U.S. 855 (1971)). Accordingly, if the Court finds that Hooks breached the Hooks/Corps contract, the burden of persuasion shifts from Eckstein to Hooks to show that the breach could not have caused the accident.

a. Obstruction

The Rivers and Harbors Act prohibits vessels from become "obstructions" in an effort to prevent collisions. It provides, in relevant part: "It shall not be lawful to tie up or anchor vessels or

other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft [...]." 33 U.S.C. § 409. "Obstruction" is defined as "anything that restricts, endangers, or interferes with navigation. 33 C.F.R. § 64.06. The percentage of the width of the waterway which is not obstructed is significant in determining whether the waterway is obstructed under the Act. *See Williamson Leasing Co., Inc. v. American Commercial Lines, Inc.*, 616 F. Supp. 1330, 1338 (E.D. La. 1985); *see also Orange Beach Water*, 680 F.2d at 1378 (11th Cir. 1982) (affirming district court's finding that a vessel occupying 40 percent of channel was obstruction under Rivers and Harbors Act).

The Corps/Hooks contract provides, in pertinent part:

> The Government will not undertake to keep the channel free from vessels or other obstructions, except to the extent of such regulations, if any, as may be prescribed by the Secretary of the Army, in accordance with the provisions of Section 7 of the River and Harbor Act of 8 August 1917. The Contractor will be required to conduct the work in such a manner as to obstruct navigation as little as possible, and in the case the Contractor's plant so obstructs the channel as to make it difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage.

(Ex. 12 at 11).

The MIKE HOOKS was involved in five incidents prior to the accident with the PAT MCDANIEL. On May 29, 2008, the WALTER CENAC lightly hit the Dredge when the Dredge was at mile 99. (Cowick: Tr. 384; Ex. 21 at 5). According to the MIKE HOOKS Daily Production Report, between the evening of May 30, 2008 until the early morning of May 31, 2008, while the MIKE HOOKS set up to dredge near the Wax Lake intersection, a tow got stuck or "[ran] aground" on the south bank of the Wax Lake intersection because the tow, which had been heading westbound, had not accounted for the southbound current and had not aimed north enough. (Ex. 47 at 4; Darby: Tr. 49-50). As Hooks's navigational expert Michael Marshall explained, a grounding

is dangerous, especially in Wax Lake, and especially under prevailing conditions that day, because barges can be swept away and wires can break as a result. (Tr. 230). Also according to the Daily Production Report, some eastbound vessels passed, two of which came within inches from hitting the Dredge. (Ex. 47 at 4). Finally, the SARAH D ran into the MIKE HOOKS at approximately 4:20 a.m. (Ex. 47 at 4). According to a computer-generated document that Hooks surveyor and civil engineer Gary Cowick processed, the MIKE HOOKS was around fifty feet from the center of the channel at the time of the SARAH D accident. (Tr. 410, Ex. 7 at 1-2). It was unusual to experience that many incidents. (Darby: Tr. 47). The parties do not dispute that all incidents involving the MIKE HOOKS that occurred before the accident with the PAT MCDANIEL occurred while the Dredge was operating in the middle of the channel. (Rec. Doc. 322 at 2, Rec. Doc. 323 at 9).

The Court finds that the Dredge was also in the channel when the PAT MCDANIEL allided with the Dredge. Indeed, this was the Court's finding during trial: "I have got enough to know about whether [the Dredge] was in the channel or not. . . . [H]e was in the channel. (Tr. 623). The testimony of Hooks's own leverman, John Darby, is particularly persuasive on this point. He testified that the Dredge went "as far as we could go" away from the center of the channel, but that nevertheless "100 percent of the Dredge [was] in the channel" at the time of the incident. (Tr. 62-63). The Dredge was pushed up on the north bank, to the east of the narrowest part of the channel. (Domengue: Tr. 87, Ex. 7 at 3-4). The Dredge was moved to the north bank of the channel in order to make emergency repairs to avoid sinking after the SARAH D. (Cowick: Tr. 415). When asked why the Dredge was pushed up to that location, Domengue testified "I figured we plenty wide enough that we should be out of harm's way." (Tr. 87). The channel was between 400 and 800 feet wide, from the north bank to the south bank, at the point where the Dredge was moored. (Marshall: 400 to 600 feet wide, Tr. 209-210; Darby: 600 to 800 feet wide, Tr. 15). The MIKE HOOKS was

approximately 56 feet wide, (Marshall: Tr. 209), and the tender attached to it, on which men were making repairs to the Dredge, was approximately 8 feet wide. (Williamson: Tr. 324). The Dredge was parallel to the bank. (Ex. 7 at 3-4). The smallest estimate of the width of the channel where the Dredge was stationed is 400 feet. Thus, at most, the Dredge was taking up approximately 62 feet of a 400 foot channel, or around 15 percent of the waterway. The largest estimate is 800; thus, the Dredge was taking up at least around 7.5 percent of the waterway.

The Court is persuaded that the Dredge was not an obstruction under the Rivers and Harbors Act. It took up at most 15 percent of the channel. Eckstein has pointed to no authority suggesting that occupying such a percentage of space constitutes an obstruction, and the Court has found none. Eckstein argues that the facts are similar to those in *Cahill Towing Line, Inc. v. ANNA W.*, where a tug pushing a barge struck a dredge stationed with its stern "immediately" next to the opening of a draw bridge. 22 F.2d 273, 274 (2d Cir. 1927). The bridge obstructed the tug's view of the barge such that "the tug could not estimate the distance the dredge lay from the bridge." 22 F.2d at 274. In this case, there was no question as to the PAT MCDANIEL's ability to see the MIKE HOOKS. Joseph Valantour, the Corps senior construction representative overseeing the MIKE HOOKS dredging operation, who was there on the day of the accident, testified that it was a clear day and that it was light at the time of the accident, and this testimony was not seriously contested. (Tr. 605-606). Moreover, Marshall, Hooks's marine navigation expert, testified that there was no indication that Williamson, the SARAH D, or the WALTER CENAC did not see the Dredge well before hitting it. (Tr. 236-237). Accordingly, *Cahill* is inapposite. Likewise, Eckstein cites to *The Bern*, which held that a dredge anchored in a channel where navigation was difficult constituted an obstruction when the dredge could have anchored in safer locations. 255 F. 325 (2d Cir. 1918). However, unlike in that case, where the dredge's position gave the passing tow only 200 feet to pass, *The Bern*,

255 F. at 326, here, the PAT MCDANIEL had at least nearly twice that space to pass.

In addition, the Court finds that Hooks did not breach the "Obstruction" provision of the Corps/Hooks contract because the Dredge was not "at work" at the time it was moored to the north bank of the channel. The provision is in force only when the Dredge is "conduct[ing] the work" it was hired to do. However, at the time the MIKE HOOKS moored itself to the north bank of the channel, it was stationary and not dredging. (Domengue: Tr. At 120). It was making repairs. Domengue even stated that at the time the MIKE HOOKS was making repairs to the Dredge following the accident with the SARAH D, Hooks was "not working for the Corps." (Tr. 87). There is insufficient evidence showing that Hooks was bound by the "Obstruction" provision of the contract while not performing its duties under the contract. In contrast, some provisions applied 24 hours a day, such as the requirement that a picket boat be "operated" "to assist passing navigation traffic and/or to assist the dredge." (Ex. 10 at 3). Thus, Hooks was not an obstruction under the Rivers and Harbors Act or the Corps/Hooks contract.


b. Narrow Channel

However, the Court finds that Hooks was stationed in a narrow channel in violation of INR 9. The purpose of this Rule is to prevent collisions, and it provides, in pertinent part:

(g) Avoidance of anchoring in narrow channels

Every vessel shall, if the circumstances of the case admit, avoid anchoring in a narrow channel.

33 U.S.C. § 2009. Courts generally hold that a body of water is a narrow channel under INR 9 if it is less than 1,000 feet wide. *See Marine Transport Lines v. M/V TAKO INVADER*, 37 F.3d 1138, 1442 (5th Cir. 1994). However, in determining whether a vessel violated INR 9, courts consider not

just the size of the waterway but also the size of the vessel and the character of the water conditions.

*See Weathers Towing v. M/V HERMAN POT*, 570 F.2d 1294, 1295 (5th Cir. 1978) (per curiam) (finding that a 1,200 feet wide waterway was a narrow channel where the obstructing vessel was 175 feet wide and the water was high).

Furthermore, under 33 C.F.R. § 162.75(b)(3)(i), vessels are not permitted to anchor in narrow channels except under two circumstances:

> Vessels or tows shall not anchor or moor in any of the land cuts or narrow parts of the waterway, *except in an emergency or with permission of the District Commander*. Whenever it becomes necessary for a vessel or tow to stop in any such portions of the waterway, it shall be securely fastened to one bank and as close to the bank as possible. This shall be done at such a place and under such conditions as will not obstruct or prevent the passage of the other vessels or tows. Stoppages shall be only for such periods as may be necessary.

33 C.F.R. § 162.75(b)(3)(i) (emphasis added).

First, Marshall, Hooks's navigational expert, testified that a channel 400 to 600 feet wide was a "narrow channel," and this testimony was not convincingly challenged. (Tr. 210). The highest estimate was 800 feet, that is, 200 feet less than the width of channels typically considered to be narrow under INR 9. *See Marine Transport Lines*, 37 F.3d at 1442.

Second, the Dredge could have moored itself to make repairs at a safer location, instead of mooring itself where it did, 1,000 feet from the Wax Lake intersection (Williamson: Tr. 149; Cowick: Tr. 418), and in the channel. David Scruton, Eckstein's marine navigation expert testified that the Dredge could have effected repairs in a mooring basin located out of the channel, which he indicated on the navigation chart for the intersection between the ICW and the Wax Lake Outlet. (Tr. 623-625). There are several of these mooring basins along the ICW where a vessel can get

completely out of the channel and where the Dredge would have been protected.[10] (Scruton: Tr. 624-625). Scruton testified that "it certainly wouldn't take long" for the picket boat to pull the Dredge to the mooring basin, which was located just west of where the Dredge moored itself to make repairs. (Tr. 624). Captain Domengue specifically testified that after the incident with the SARAH D, there was a "crack above the water level of the dredge," but that "there was no imminent danger of it sinking[.]" (Tr. 106). Scruton also testified that, at the very least, "Once it was determined that [the Dredge] wasn't in imminent danger, I think that to move out of the hazardous area, which everybody has testified to, I would have thought it very prudent to move the dredge to a better location." (Tr. 632).

Third, the Wax Lake intersection has strong currents and eddies which are stronger during high water season and in windy conditions. It was high water season at the time of the allision between the PAT MCDANIEL and the MIKE HOOKS. In particular, the U.S. Corps of Engineers hydrographic surveys show a stage of a little over 6.3 feet at the Wax Lake outlet on May 29-31, 2008, and a stage of averaging about 3.0 feet on August 18-21, 2008. (Ex. 33 at 2, 4). Multiple witnesses testified to this effect, indicating that they were aware of these conditions on the day of the accident. (Williamson: Tr. 291-294, 296-304; Darby: Tr. 44-45; Domengue: Tr. 91, 99; Cowick: 388, 389). Finally, Williamson testified that the current from the Wax Lake outlet runs from north to south, and it tends to push vessels south, such that passing vessels must proceed toward the north

---

[10]Marshall explained that it is safer to anchor in shallow water than in higher water when a vessel is at risk of sinking, and that the shallower the water, the easier it is to inspect and repair damage to a vessel. (Tr. 248). Scruton testified that one of the mooring basins which he identified as a safer area to conduct repairs was 13 feet deep, compared with the location where the Dredge stationed itself, which was only 2 feet deep. (Tr. 630). The Court finds that, for purposes of avoiding another collision, the safety value of shelter from passing vessels afforded by the mooring basin trumped the shallowness of the water afforded by the north bank location that the Dredge chose.

to counteract the current. (Tr. 297-298). Hooks was also aware of the direction of the current and its strength on the day of the accident with the SARAH D and the PAT MCDANIEL because it included it as a cause of the allision in its SARAH D accident report:

> Due to the high water conditions and strong currents through Wax Outlet tow boat Sarah D. Pushing 6 barges, tried to llead [sic] his tows towards the north flaire [sic] of Wax Lake outlet. The Dredge Mike Hooks is located on the northwest flair, which is in direct line where the tow boats want to steer when east bound. This situation caused The Sarah D. to oversteer and hit The Dredge Mike Hooks.

(Ex. 36 at 4). Given that Hooks was aware that an effect of the current is that passing vessels actively steer toward the north, it should not have positioned itself on the north bank of the channel to make its repairs following the accident with the SARAH D.

For these reasons, the Court finds that the Dredge violated INR 9. The Court does not find that the emergency exception in INR 9(g), that allows a vessel to anchor in a narrow channel, applies here. Although emergency repairs had to be made, the Court is not convinced that the emergency was such that repairs could not have been made in a safer area. For the same reasons, the Court finds that Hooks also violated 33 C.F.R. § 162.75(b)(3)(i). Furthermore, the Dredge had permission of the District Commander, via the Corps/Hooks contract, to be anchored in the channel – even in the middle of the channel, while it dredged. (Marshall: Tr. 249). However, as stated earlier, at the time the MIKE HOOKS moored itself to the north bank of the channel, it was stationary, not dredging, and was "not working for the Corps." (Domengue: Tr. at 87). There is insufficient evidence showing that Hooks was permitted under the Hooks/Corps contract to anchor in the channel for any other reason than to dredge or perform other duties under the contract.

The *Pennsylvania* presumption applies to Hooks's violation of INR 9, and Hooks has failed to convince the Court that its action in mooring itself where it did could not have contributed to the accident. Even if the presumption did not apply, the Court finds by a preponderance of the evidence

that the MIKE HOOKS's position on the north bank was a legal cause and a proximate cause of the accident because Hooks could have made repairs in a less hazardous location.  Had it been stationed in a protected area such as a mooring basin, the PAT MCDANIEL would not have struck it.  The Court also finds that it was entirely foreseeable that an allision would occur at this location given the narrowness of the channel and the southbound eddy that caused passing tows to drive toward the north bank.

### c. Picket Boat Provision of the Hooks/Corps Contract

Another provision of the contract Hooks entered into with the Corps in connection with its dredging activity in the ICW required the following in order to avoid collisions with passing navigation:

> 1.3.1. Picket Boat Item
> The Contractor shall provide one 1200 HP towboat to serve as a picket boat to assist passing navigation traffic and/or to assist the dredge.  The picket boat shall be operated 24 hours a day, with a minimum full time crew of an operator and deckhand for each boat each shift.  The picket boat shall meet all applicable US Coast Guard regulations and shall be certified by the US Coast Guard.  The picket boat shall be equipped with:
>     1. air conditioning and heating
>     2. VHF radio for ship-to-ship communications, as described in paragraph 02327-1.4 entitled "Communications Equipment";
>     3. navigation radar, as described in paragraph 02327-1.5.6. entitled "Navigation Radar.

(Ex. 10 at 3).

The parties do not dispute that a shift is 12 hours long.  Accordingly, the contract mandated that the picket boat be manned by a crew of four.  Yet the log of the CAPTAIN TOMMIE JR. indicates three crew members – Johnny, Dennis, and Craig – were present on May 29, 30, and 31. (Ex. 21 at 5, 6, 7).  Johnny Hebert, captain of the CAP'N TOMMIE VIZIER JR., confirmed that the three crew members on those days were himself, Dennis Hampton, and Craig Townsley.  (Tr. 470).

Moreover, Marshall, Hooks's expert, testified as follows:

> Q: There is no way you can man a picket boat 24/7 with only three people, is there?
> A: It would depend on the service of any boat whether it could operate 24/7 with three people. The 12-hour rule limits the number of hours the licensed personnel can work.
> Q: Regardless, the contractor expressly requires their picket boats have four people.
> A: Yes.

(Tr. 226). Therefore, the Court finds that Hooks breached this portion of the picket boat provision of the contract because the picket boat's crew was made up of only three members.

Relatedly, the Hooks/Corps contract required Hooks to inspect the picket boat and maintain daily reports of inspections. (Ex. 12 at 3). The Corps construction representative, Valantour, confirmed that Hooks, as the contractor, was responsible for effectuating these inspections. (567). Yet the daily Quality Control Report, which shows that the picket boat arrived on May 25, 2008, does not indicate that the picket boat was ever inspected or given a safety check. (Ex. 63 at 1). The Court infers that no inspection took place, and that an inspection may have revealed that the picket boat had one less crew member than required. Thus, the Court finds that Hooks breached this portion of the Hooks/Corps contract that relates closely to the contract's picket boat provision.

The Court also finds that the Hooks/Corps contract required that the picket boat be willing and able to physically assist the Dredge. The contract itself does not specify that "assist" encompasses physical assistance, but other language in the contract itself suggests that "assist" included physical assistance. A vessel of considerable strength – 1200 horsepower – was required[11], and it was required to assist 24 hours a day. (Ex. 10 at 3). Valantour added that this requirement applied even while the dredge stops to wait for vessels to pass, and during "temporary down time" for repairs in the event of a casualty. (Tr. 566-567).

---

[11]There is no dispute as to the boat's strength; it complied with the 1200 horsepower requirement. (Hebert: Tr. 471).

In addition, testimony at trial convinces the Court that physical assistance was intended under the contract. Gary Cowick, the surveyor for Hooks, stated in a recorded statement that physical assistance was required:

> . . . Wax Lake is a well-known hazardous dredging area, well known. It's expected when you come here that you are going to have a close call. That's why the Army Corps of Engineers is willing to pay that extra money for that boat. His job is to get by the bow of that boat and he's supposed to ride along with that tow as it's coming by the dredge. His job is to keep them off us the best way he can. I mean, without endangering himself, you know.

(Ex. 66 at 19). Cowick further elaborated at trial:

> My understanding of it is he is supposed to assist us just like it says he is supposed to be right there. And when they start getting close to the dredge, he should already be right there already. We pay him for this, and then he should follow these vessels. And if they ask, if they know - first, he is supposed to ask them for assistance. And if they say, no, I don't need assistance, then that's fine. He supposed to just ride along right along side of them. If he sees that that boat is not handling it properly, then he is allowed to intervene and try to assist without endangering hisself [sic] or his crew members.

(Tr. 386). When asked if the picket boat captain said he would perform any of these duties, Cowick testified: "He told us straight up he would not do it." (Tr. 386).

Further, Valantour, the Corps representative for ensuring that the Hooks/Corps contract was being complied with, testified as follows:

> A. Did the picket boat respond to you when you told him that you would like him to assist?
> Q. At that point I don't remember exactly. But whether he directed, he told me that he was, he was told by the Coast Guard he did not have to assist vessels. All he had to do was talk on the radio.
> Q: And does that comply with your Corps contract?
> A: No.

(Tr. 577). Valantour also responded affirmatively when asked "Between 8 and 12 [the day of the accident with the PAT MCDANIEL], the picket boat was not performing as required under the Corps' contract[.]" (Tr. 578). He said this in reference to the picket boat not providing physical assistance. (Tr. 578).

Moreover, the Court finds that before the PAT MCDANIEL accident, Hooks was on notice that the picket boat was not willing to perform these duties. Thus, Hooks was negligent to nevertheless remain in the waterway. First, according to Cowick's testimony, as well as the picket boat's log notes, on May 29, 2008, the WALTER CENAC struck the MIKE HOOKS at mile 99. (Cowick: Tr. 384; Ex. 21 at 5). Cowick described the conversation the MIKE HOOKS had with Hebert when the Dredge called the picket boat:

> A. The dredge called the picket boat, wanted to know what just happened, why come he wasn't there? Why come he didn't do nothing? It was just a small hit, it wasn't a bad one. But he wanted to know what happened. And the picket boat, *that's when* the picket boat told us that his understanding of what he was supposed to do was to communicate with the, these people on the radio, not to do nothing but just to talk to them on the radio.
> Q. Not to physically assist but only to talk?
> A. Yes, sir.

(Tr. 384) (emphasis added). When asked to repeat exactly what he had heard Hebert say, Cowick stated "I heard him tell us that he was not going to assist any boat, that his job was to only talk to him on the radio." (Tr. 385). Hebert testified that he was not directly told by anyone on the Dredge that he needed to modify his behavior by physically assisting after he failed to do so during the two near misses and the accident with the SARAH D. (Tr. 494). Second, Valantour testified that after the accident with the SARAH D but before the accident with the PAT MCDANIEL, he was "concerned to the point that [he] felt this is time to fire the picket boat[.]." (Tr. 577-578). Cowick also testified that the picket boat did not assist at the time of the near misses, (Tr. 386), or with the passing of the SARAH D (Tr. 387), all of which occurred prior to the accident with the PAT MCDANIEL.

Hebert did not say he would not physically assist at all. Instead he said he would do so as long as it would not endanger his boat or his crew. In particular, he made it "expressly clear" that he would not assist passing navigation on the ground that "it was going in places where the current

was running harder than where they were at before." (Tr. 475). He also testified that he was "not going to help anybody" where the MIKE HOOKS was located when it was hit by the PAT MCDANIEL because the PAT MCDANIEL was "coming almost nine mile an hour." (Tr. 481). Further, he agreed at trial that "the only time [he] would have taken some action to keep a tug or tow from bumping into the dredge is if someone's life was in danger." (Tr. 484). This reasoning, combined with Hebert's repeated communication to the Hooks crew that he would not physically assist the Dredge, indicates that Hooks was well on notice before the accident with the PAT MCDANIEL that Hebert would not fulfill the duties of the picket boat as required under the Hooks/Corps contract. Thus, Hooks proceeded on the ICW without a picket boat that met the Hooks/Corps contract requirement, and thus it breached the picket boat provision of the contract. (Ex. 10 at 3).

Hooks fails to meet its burden under the *Pennsylvania* Rule of showing that its breach of the picket boat provision could not have been a cause of the accident. On the one hand, insufficient evidence was produced to show that a crew of three instead of four could have contributed to the accident. It was not because it was undermanned that it did not provide assistance.[12] Instead, it did not provide assistance because Hebert decided not to, and his decision was not based on the fact that he had only two other men. Rather, he made that decision because he believed either the various vessels were going too fast or because the current was too strong, or because he did not believe anyone's life was in danger.

---

[12]Likewise, the Court declines to conclude that Hooks's failure to report its daily inspection, if any, of the CAP'N TOMMIE VIZIER JR., could have caused the accident. Had Hooks inspected, it would have noticed that there were only three crew members. Again, the presence of only three men could not have been a cause of the accident since Hebert had decided that he would not assist, and that his decision was not based on the fact that he had only two other men.

However, it is clear that the absence of a picket boat that was willing to physically assist did contribute to the accident. Williamson explained how the picket boat could have physically assisted:

> I would have put him on my stern with soft lines like I described earlier with quarter bitts and both hanging over the stern of the barge on the other side, or I would have moved over to one string, and he would have made up on the other string of three and in the back of the barges with me.

(Tr. 323). Williamson added that such physical assistance would have given him "more rudder power, you know. That's all I really wanted, more steerage." (Tr. 323). Domengue, captain on the MIKE HOOKS, agreed that "[t]here are a whole bunch of ways the picket boat can assist without putting himself in danger"; physical assistance is not limited to putting oneself in a "pinched mode," that is, in a position where he might get pinched in between the dredge and the tug. (Tr. 112-114). Moreover, Marshall, Hooks's navigational expert, agreed that a model bow tug such as the CAP'N TOMMIE VIZIER JR. was capable of providing physical assistance. (Tr. 233, 236). Finally, the picket boat was lined with tires, which Hebert admitted were there to allow it to push against other vessels. (Tr. 471-472). With such assistance, the PAT MCDANIEL could have avoided hitting the MIKE HOOKS. Hooks has failed to show that its picket boat's failure to physically assist the PAT MCDANIEL avoid the MIKE HOOKS could not have contributed to the accident between the two vessels.

    d. <u>Passing Arrangements under the Hooks/Corps contract and the Radio Telephone Act</u>

The Hooks/Corps contract required Hooks to implement an accident prevention plan (Ex. 12 at 2). The plan submitted by Hooks stated: "The mate on watch shall constantly monitor the HF radio for traffic and shall make proper passing arrangements with traffic." (Ex. 30 at 2). Eckstein also argues that the Radio Telephone Act applies to Hooks and that under it, Hooks's captain was

not permitted to delegate the responsibility of making passing arrangements. That act provides that:

> The radiotelephone required by this chapter is for the exclusive use of the master or person in charge of the vessel, or the person designated by the master or person in charge to pilot or direct the movement of the vessel, who shall maintain a listing watch on the designated frequency. Nothing contained herein shall be interpreted as precluding the use of portable radio telephone equipment to satisfy the requirements of this chapter.

33 U.S.C. § 1204. Like the picket boat provision, the provision requiring monitoring at all times and making passing arrangements was enforceable at all times, not just while dredging or performing other duties under the contract.

The Court is persuaded that the Hooks leverman, John Darby, was monitoring the radio for traffic as required by the Hooks/Corps contract and that Hooks did not improperly delegate that duty to the picket boat. In his office, Darby had radios (Tr. 27) and an automatic identification system ("AIS"), which displays the location and name of a vessel on a screen, although it does not show the speed of the vessel. (Tr. 34-36). Darby testified that he spoke to Williamson when Williamson was at mile 99, and that the "conversation" consisted of Darby directing the PAT MCDANIEL that he could pass "on two whistles" and Williamson agreeing (Tr. 32), but that after that, "there was no additional communication" between him and the PAT MCDANIEL until the PAT MCDANIEL hit the MIKE HOOKS. (Tr. 32). Later in his testimony, Darby reiterated that he spoke to Williamson when Williamson was at mile 99. (Tr. 34). The Court infers that Darby was monitoring for traffic because he knew where the PAT MCDANIEL was when he spoke to Williamson (mile 99). That Darby was monitoring for traffic is corroborated by Marshall's testimony that there was an operating radio in the dredge's lever room and that Darby was monitoring it all the time. (Tr. 255). Furthermore, while Darby testified that it was "helpful for the picket boat to communicate with the tows" because this allowed him to "concentrate on operating," (Tr. 38), and that "either [he] or the picket boat" makes passing arrangements with passing vessels, (Tr. 31), he did not testify that he

24

or any other Hooks employee asked the picket boat to perform that duty in Hooks's place. The Court finds there is insufficient evidence showing that Hooks improperly delegated its duty to monitor to Vizier. Accordingly, Hooks did not violate the Radio Telephone Act.

However, the Court finds that Hooks failed to make proper passing arrangements with the PAT MCDANIEL, as required under the Hooks/Corps contract. Darby did not give Williamson all the pertinent information about the situation, and thus any agreement, if made, was void. When asked if he had notice that the PAT MCDANIEL was coming, Darby testified "Absolutely." (Tr. 37). At the moment when he says he made the arrangement, approximately 30 minutes to an hour before the PAT MCDANIEL arrived, Darby did not ask Williamson to stop and wait while the MIKE HOOKS made repairs. (Tr. 37). Nor did he inform Williamson that he "had men on the channel side of the dredge trying to make repairs from a support vessel." (Tr. 37). Nor did he inform Williamson about the grounding on the south bank earlier that morning. (Tr. 38). Williamson was not in a position to make a passing agreement without this knowledge.

Breach of the contract triggers application of the *Pennsylvania* Rule, requiring Hooks to show that its breach could not have been a cause of the accident with the PAT MCDANIEL. Indeed, Williamson testified that neither the Dredge nor the picket boat told him about the two near misses, the accident with the SARAH D, and the grounding. (Tr. 321-322). He testified that if anyone had told him about them, he would have known that the conditions were not "normal" and he "would have just stopped or gotten a picket boat for sure." (Tr. 323). Hooks argues that Williamson could have learned of all or at least some of these incidents via Berwick radio, which reports incidents in the area on Channels 11 and 13, and that any failure by Williamson to hear about the incidents was due to negligence on his part. However, Hooks had the duty to inform Williamson regardless of any information Berwick disseminated. The information, coming from Hooks directly, would have been

useful even if Williamson had already been made aware of the incidents through the Berwick radio announcements, as it would have further convinced him not to attempt to pass at the time he did. The Court finds that had Hooks had informed Williamson that men were attempting to make repairs on the channel side of the dredge, and that the previous incidents had occurred, and had Hooks asked Williamson not to pass, Williamson at the very least may have waited to pass until the repairs were over. Had he done so, the accident would not have occurred.

Thus, the Court finds that because of Hooks's violation of INR 9 in failing to move to a safer location for repairs, and its breach of the Hooks/Corps contract because of the picket boat's unwillingness to actively assist passing traffic, as well as the failure by Hooks to advise Williamson of the prior incidents at the site of the dredge and the current conditions while making passing arrangements, Hooks was 70 percent at fault for the damages caused by the accident with the PAT MCDANIEL.

### 2. Eckstein's Alleged Fault

Mike Hooks alleges that Eckstein violated INRs 2, 5, 6, 7, 8, 9, 18, and 34. There is no dispute that all of these rules are intended to prevent collisions. Therefore, violation of any of these provisions triggers application of the *Pennsylvania* Rule. *The Pennsylvania*, 86 U.S. at 136. The rules are set forth below.

Responsibility (INR 2)

(a) Exoneration

Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or the neglect of any precaution which may be required by the ordinary practice of seamen, or by the circumstances of the case.

(b) Departure from rules when necessary to avoid immediate danger

In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

33 U.S.C. § 2002.

Look-out (INR 5)

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 U.S.C. § 2005.

Safe Speed (INR 6)

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(i) the state of visibility;
(ii) the traffic density including concentration of fishing vessels or any other vessels;
(iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
(iv) at night the presence of background light such as from shores lights or from back scatter of her own lights;
(v) the state of the wind, sea, and current, and the proximity of navigational hazards;
(vi) the draft in relation to the available depth of water; [...].

33 U.S.C. § 2006.

Risk of Collision (INR 7)

(a) Determination if risk exists

Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist. [...]

33 U.S.C. § 2007.

Action to Avoid Collision (INR 8)

(a) General characteristics of action taken to avoid collision

Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

(b) Readily apparent alterations in course or speed
Any alteration of course or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided. [...]

(d) Action to result in passing at safe distance

Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.

(e) Slackening of vessel speed

If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion. [...]

33 U.S.C. § 2008.

Narrow Channel (INR 9)

(a) Keeping near to outer limit of channel or fairway which lies on vessel's starboard side; exception

(i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable. [...]

33 U.S.C. § 2009.[13]

Responsibilities Between Vessels (Rule 18)

_____

[13] The other exception applies only to power-driven vessels in narrow channels "on the Great Lakes, Western Rivers, or waters specified by the Secretary" and thus is inapplicable in this case. 33 U.S.C. § 2009(a)(ii).

Except where Rules 9, 10, and 13 otherwise require:

(a) Power-driven vessels underway

A power-driven vessel underway shall keep out of the way of:

(i) a vessel not under command;
(ii) a vessel restricted in her ability to maneuver;
(iii) a vessel engaged in fishing; and
(iv) a sailing vessel. [...]

33 U.S.C. § 2018.

Danger Signal (Rule 34)

[...]

(d) Doubts or failure to understand signals
When vessels in sight of one another are approaching each other and from any cause either the vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. This signal may be supplemented by a light signal of at least five short and rapid flashes.

33 U.S.C. § 2034.

Hooks argues that Eckstein violated INR 5 for failure to maintain a proper lookout, INR 6 for speeding, INR 9 for failing to keep as close to the outer limits of the channel as possible, INR 18 for keeping out of the way of an anchored vessel, and INR 34 for failing to sound a danger signal. (Rec. Doc. 323 at 19). The Court does not find that Eckstein violated any of these rules. Hooks also argues that Eckstein violated INR 2 by failing to navigate in a seaworthy manner, including by failing to make a passing arrangement with the MIKE HOOKS. (Rec. Doc. 323 at 19). Further, Hooks argues that Eckstein violated INR 7 because Williamson perceived a risk of allision and failed to do all things necessary to avoid it. (Rec. Doc. 323 at 19). Similarly, Hooks maintains that Eckstein violated INR 8 by not taking affirmative action to avoid alliding with Hooks, which was restricted in its mobility. (Rec. Doc. 323 at 19). The Court agrees that Eckstein violated INRs 2,

7, and 8.

Stephen Williamson, Captain of the PAT MCDANIEL and employee of Eckstein at the time of the accident, was very familiar with the Wax Lake intersection, as he had been through it "hundreds of times." (Tr. 130). At least two hours before the accident with the MIKE HOOKS, Williamson learned through Berwick Traffic that there was a 2.5-knot current going from north to south in the ICW. (Tr. 132). He also knew that when the water is as high as 6 feet, as he knew it was that day, there is a 2-knot current running from east to west in the ICW. (Tr. 132-133). Further, he knew that there was an eddy on the northern side of the Wax Lake intersection and that it might pull his flotilla to the north, counteracting the southbound current. (Tr. 134). Williamson testified that he was his own lookout and that no one else on the PAT MCDANIEL was acting as a lookout. (Tr. 142). He was unaware of the accident between the MIKE HOOKS and the SARAH D or that the ICW had been shut down for a period, and if the crew member in charge of listening to the radio on the PAT MCDANIEL had heard about the incident, he did not inform Williamson. (Tr. 145).

After passing mile 99, Williamson spoke to a Settoon boat who informed him that the Dredge was "a little bit farther north than he was earlier." (Tr. 146). He testified that he attempted to contact the Dredge "many times," but that he obtained no answer. (Tr. 146, 154). This directly contradicts Darby's testimony that the two had a single conversation, that it occurred when Williamson was around mile 99, and that in that conversation Darby instructed Williamson that he could pass on two whistles and Williamson agreed. (Tr. 32). Williamson's conversation with the Settoon boat around mile 99 mirrors the conversation Darby testified he had with Williamson:

Q. Did you pass the SARAH D?
A. I think I passed him. He was over Mile 99.
Q. You talked to the SARAH D about anything?
A. No, sir.
Q. Did you ask any of these tugs that you passed about the conditions of the ICW?

A. I talked to several – I tried to call the dredge and the picket boat at the Wax Lake and one of the, I think it was the one last one I met a Settoon boat had told me that dredge was a little bit farther north than he was earlier.  And that's the only conversation I had with him other than to set up passing whistles.

(Tr. 145-146).  This resemblance suggests that Williamson may have mistakenly believed he was speaking to the Settoon when in fact he was communicating with the Dredge.  The Court nevertheless finds that Williamson failed to make a passing arrangement because he subjectively believed he had not made one.

Furthermore, even though he saw the notice to mariners indicating that information regarding the Dredge would be on Channels 13 and 16, and even though he knew that Channel 16 is the one used for communicating emergencies, he only tried to contact the Dredge through Channel 13 and not 16.  (Tr. 144, 151-152).  Williamson reasoned that he "may have had his hands full" and he knew that Channel 13, the channel he was using, was functioning properly. (Tr. 152).  He knew that the Channel 16 was also working but chose not to use it.  (Tr. 152-153).  The Court finds that it was imprudent of Williamson not to attempt to contact the Dredge through Channel 16.  If Williamson was too busy to do so, he should have stopped to perform the call.  Instead, "After no contact with the dredge or the picket boat, [he] made the decision to cross."  (Tr. 158).

Williamson first saw the Dredge when he was about 1,000 feet away from it, since he testified that he saw the Dredge when he came through the intersection from the east, headed west, and it is undisputed that the Dredge was about 1,000 feet west of the intersection.  (Tr. 149).  As stated earlier, Williamson's testimony at trial and his deposition testimony, with which he was impeached at trial, establishes that as he approached the Dredge, he believed that the Dredge was spudded down and had restricted mobility.  (Tr. 147, 168; Ex. 45 at 30).  He believed that the Dredge was stationary when he was as far as one and a half miles away from the Dredge.

Williamson also testified that he directed his vessel in the same way he always did, despite his knowledge that a dredge was stationed where it was. (Tr. 168-169). He moved at the same speed as usual, to counteract the southbound current. (Tr. 173). Marshall, Hooks's navigational expert, admitted that he assumed Williamson was going too fast simply because he ran into the Dredge, and not based on facts specifically regarding his speed, the current, the prevailing conditions, and the PAT MCDANIEL's maneuverability. (Tr. 238). Marshall also admitted that he could not opine as to a "safe speed" for proceeding across the Wax Lake intersection, other than saying "[h]e should have gone at a speed sufficient to overcome the draft and maintain control to avoid the collision." (Tr. 240). Furthermore, Eckstein's expert, Scruton, testified that Williamson "had to have some kind of speed to get across the spillway" because of the current. (Tr. 647). Hebert, the picket boat captain, testified that the PAT MCDANIEL was going "way over eight" miles per hour as he approached the Dredge, according to his AIS screen. (Tr. 492). However, Williamson testified that the PAT MCDANIEL was incapable of going faster than 7 miles per hour, and that this was the speed at which he was going when he entered the intersection. (Tr. 179). Thereafter, he slowed down. (Tr. 179). Williamson could not say how long it would take for him to stop at a speed of 7 miles per hour because "It depends on the depth of the water. It depends on the current. It depends on so many factors." (Tr. 180). In conclusion, there was insufficient evidence on the effect of Williamson's speed on the PAT MCDANIEL's maneuverability given the prevailing conditions that day. Thus, the Court finds that Williamson did not violate INR 6.

The Court declines to decide whether or not Williamson violated INR 5. Hooks presented no evidence that Williamson was not permitted to be his own lookout. Furthermore, the Court is unpersuaded that the absence of an independent lookout could have contributed to the accident because Williamson testified that he saw the Dredge from about 1,000 feet away, and that as he

approached it, he noticed it was stationary, and the Dredge's stationary position did not affect his decision to attempt to pass the Dredge.

The Court finds that Williamson did not violate INR 9(a). Insufficient evidence was presented to show that he failed to keep as near to the outer limits of the channel as he could in the prevailing circumstances. Nor does the Court find that Williamson violated INR 18. That rule defers to Rule 9. If a vessel is anchored in a narrow channel in violation of INR 9, then the duty of a moving vessel in INR 18 does not attach. The Court found above that Hooks violated INR 9. Accordingly, INR 18 does not apply against Eckstein.

The Court declines to find whether or not Williamson violated INR 34 because failure to do so could not have contributed to the accident. Eckstein had a duty to sound the alarm signal only once he was in sight of the MIKE HOOKS, and then, "immediately" after he became doubtful that Hooks was doing enough to avoid a collision or that Hooks failed to understand Eckstein's intention to pass the MIKE HOOKS. Williamson did not testify that he believed, much less doubted, that the MIKE HOOKS crew could do anything to avoid being run into by the PAT MCDANIEL. Darby, one of Hooks's Captains, testified that he knew the PAT MCDANIEL would hit the MIKE HOOKS about two minutes before it happened. (Tr. 66). In response, he radioed to his crew to "get out of the way, get all the stuff starboard side of the dredge." (Tr. 66). Beyond these actions, there was little the Dredge could do to avoid the accident because it was spudded down, and Eckstein was aware of this by that point. Therefore, Rule 34 is not applicable to this case.

However, the Court finds that Williamson was negligent in violation of INRs 2, 7, and 8 and the notice to the mariners indicating that passing arrangements were required (Tr. 198), because he failed to make a passing arrangement with the Dredge before attempting to pass it. When he was unable to reach the Dredge, he could have waited until the Dredge responded to his calls. He

admitted as much at trial. (Tr. 159). He also admitted that he could have waited until he reached the picket boat. (Tr. 159). He could have attempted to contact the Dredge via Channel 16, which he knew the Dredge was using. (Tr. 151-152). Williamson also violated INR 7 because the Court finds he perceived a risk of collision and ignored it by deciding to pass the Dredge without having made a passing agreement. Williamson should have suspected that conditions might be unusual when he saw the Dredge on the north bank and yet the Dredge was not responding to his calls. If he had waited for more information, he would have learned the reason why the MIKE HOOKS was stationary – because it was effectuating repairs from a recent accident. Furthermore, Williamson knew about the high water and cross-current conditions that day, and he still chose to go forward without word from the Dredge. For the same reasons, he breached his duty under INR 8 to take effective action to avoid alliding with the Dredge.

Eckstein plainly fails to meet its burden under the *Pennsylvania* Rule of showing that Williamson's violation of INRs 2, 7, and 8 could not have contributed to the accident. If Williamson had stopped and waited until he actually reached a MIKE HOOKS crew member to make a passing arrangement with the Dredge, he may have learned that the Dredge had been involved in multiple incidents since the night before and this may have alerted him that the conditions were too dangerous for him to pass. Thus, the Court finds Eckstein at fault for 30 percent of the damages caused to the MIKE HOOKS.

### C. Eckstein's Third Party Claims Against Tommie Vizier

Eckstein asserts third party claims against Vizier under Federal Rule of Civil Procedure 14(c). Each of these claims, if proven, would absolve Eckstein of all or part of its fault with regard to the casualty between the MIKE HOOKS and the PAT MCDANIEL. Eckstein specifically claims

that Vizier was negligent toward Hooks in that it violated INR 2 and the industry standard of care, and in that it breached a contract it had with Hooks as well as the warranty of workmanlike performance.

Eckstein attempts to argue that Vizier was bound by the terms of the Hooks/Corps contract, including the term that the picket boat was to "assist" and have a crew of four. However, it is undisputed that Vizier did not sign the contract, and Eckstein provided insufficient evidence showing that he was nevertheless bound by its terms. Hebert did not receive from Hooks or anyone any written or oral instructions with regard to his role as a picket boat. (Tr. 499). The Court infers from this that Hebert did not receive a copy of the Hooks/Corps contract and was not otherwise made aware of its terms. Furthermore, Captain made it "expressly clear to the dredge personnel" "on more than one occasion" that he would not assist passing navigation traffic. (Tr. 475). Accordingly, the Court is convinced that Vizier was not bound at least by that term of the Hooks/Corps contract. Furthermore, the Radio Telephone Act charged the *Dredge*, not the picket boat, with the non-delegable duty of making and executing passing agreements. The Court cannot find the picket boat liable under a statute whose applicability derives solely from the terms of a contract to which the picket boat is not bound.

Eckstein also argues that there was a contract between Vizier and Hooks, and one of the terms was that Vizier was to physically assist. First, the Court notes that Eckstein admits that "No one else [besides Longman's] received payment, and Hooks did not enter into any other direct contracts with anyone else, including Vizier." (Rec. Doc. 322 at 27). Second, Eckstein presented no evidence of a written agreement between Hooks and Vizier. The picket boat did not receive oral or written instructions as to what its specific role would be. (Hebert: Tr. 499). Indeed, it appears the sole written document referring to the duties of the picket boat is the Hooks/Corps contract.

Third, there is insufficient evidence to show that there was a meeting of the minds with respect to this alleged term. Hebert says he was not told he was supposed to physically assist (Tr. 479), and Hooks was pertinently aware that this was Herbert's position, since he repeatedly told them he would not physically assist. (Hebert: Tr. 474-475). Hebert had so indicated in his log notes on the day of the accident between the MIKE HOOKS and the PAT MCDANIEL. (Ex. 66 at 1). Indeed, Hebert testified that he mentioned that his understanding was that his job was to monitor traffic, not assist tows, to "Berwick Traffic, dredge, my boss, United Tugs. Everybody I worked through." (Tr. 483). Therefore, there was no contract between Vizier and Hooks including a term that obligated Vizier to physically assist or have a crew of four instead of just three members.

Eckstein also claims that Vizier breached the warranty of workmanlike performance it owed to Hooks. It is well-established that this warranty is based in contract. *See Garner v. Cities Service Tankers Corp.*, 456 F.2d 476 (5th Cir. 1972) ("The [warranty of workmanlike performance] consists of the contractual obligation to perform duties under a contract with reasonable safety."). As stated above, Eckstein has not established that there was a meeting of the minds as to the specific terms of assistance and crew size. Therefore, the warranty of workmanlike performance does not apply here. Accordingly, the Court finds that neither the industry standard nor a contract created a duty to physically assist or have a four-member crew.

However, this Court is convinced that physical assistance is required by a picket boat under the industry standard of care, any obligations in the Hooks/Corps contract notwithstanding. Most of the testimony Eckstein uses to show that the industry standard for picket boats is that they must physically assist only shows that this was a term of the Hooks/Corps contract. When Cowick and Valantour stated that physical assistance was expected, it was based on the contract, not on the industry standard of care. (Cowick: Ex. 66 at 19; Valantour: 577). Yet other evidence shows that

the industry standard does require physical assistance if such assistance would not endanger the picket boat or its crew. Captain Domengue testified that there was nothing unusual about picket boats "physically going out there and nudging on tows." (Tr. 94). He also stated that he expected the picket boat to do more than "just talk." (Tr. 102). The tires around the edge of the picket boat also suggest that the picket boat sometimes pushes or nudges boats or barges because, according to Hebert, they are there "so you don't damage your boat or whatever you are pushing." (Tr. 472).

Vizier presented evidence that it was too dangerous for the picket boat to physically assist because of the current and because, according to Hebert, Williamson was going eight or nine miles an hour. However, the Court does not find this testimony credible. First, Williamson testified that the PAT MCDANIEL could not go faster than 7 miles per hour and that he slowed down as he approached the MIKE HOOKS. Second, and most importantly, Hebert was adamant from the start that he would not provide physical assistance to prevent collisions. He did not do so on May 29, during the incident with the WALTER CENAC, and he did not do so during the two near-misses. Insufficient evidence was put forth as to why he declined to physically assist in those instances, and the Court infers that Hebert would not assist, no matter the situation. This evidence is sufficient to prove by a preponderance of the evidence that Hebert had a duty to physically assist in this case, and that he breached that duty. For the same reasons as those stated in Part B.1.c. of this opinion, which addresses the ways in which the physical assistance of a picket boat could have prevented the accident, such as providing the PAT MCDANIEL with more rudder power and nudging it with the help of the tires along the side of the picket boat, the Court concludes that Hebert's failure to physically assist was a but-for cause of the accident. The Court also finds that it was a proximate cause of the accident because it was foreseeable that the picket boat's failure to assist despite its capability of doing so would make an accident more likely to occur.

In addition, the Court finds that under INR 2 and the industry standard, the picket boat was required to assist by communicating with the MIKE HOOKS and passing traffic. INR 2 governs the standard of care for seamen, and it provides that

> Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or the neglect of any precaution which may be required by the ordinary practice of seamen, or by the circumstances of the case.

INR 2(a). Hebert testified that he was listening to the radio and monitoring traffic while at Wax Lake. (Tr. 476). He also testified that his vessel was equipped with AIS, which allows him to see vessels up to 15 miles away, and that he noticed the PAT MCDANIEL approach toward the MIKE HOOKS at least a half hour before the casualty occurred. (Tr. 479-480). Nevertheless, Hebert did not communicate any information to Williamson. (Tr. 480). He did not inform him of the two near misses or the accident between the Dredge and the SARAH D or the fact that the MIKE HOOKS was stationary, conducting repairs and unable to move. His reasoning was that it was "not [his] job to tell [Williamson] what to do with his boat." (Tr. 480). Hebert also testified that the AIS informed him of the PAT MCDANIEL's speed, which he stated was almost nine miles per hour, and he nevertheless did not suggest that Williamson slow down given the circumstances. (Tr. 481). Hebert states that he would have provided more information if he had been asked for that kind of assistance. (Tr. 480).

The Court is not persuaded that demand for assistance in the form of communication of information was necessary for triggering Vizier's duty of prudent seamanship here. Hebert saw a clear risk of collision and he failed to inform the oncoming vessel to prevent its collision with the vessel that had hired him as a picket boat. Violation of a statutory rule such as INR 2 triggers the *Pennsylvania* presumption, and the Court finds that Vizier cannot rebut it. Even if the presumption

did not apply, the findings above make it clear that Hebert's silence was a but-for cause of the accident. Had he told Williamson to slow down, Williamson might have slowed down or stopped. At 15 or even 10 miles away, he would have had ample time to do so. Had he told Williamson about the previous incidents involving the Dredge, Williamson might also have decided not to proceed. Indeed, Williamson testified that he was not made aware of the prior incidences (Tr. 321-322), and that if he had been made aware of the prior incidents, he would have taken additional precautions. (Williamson: 322-323). These facts also show that Hebert's silence created a foreseeable risk of harm and thus were a proximate cause of the accident. It was foreseeable that a moving vessel might hit the Dredge, especially since, to Hebert's knowledge, there was a possibility the moving vessel's pilot was unaware that the Dredge was under repair and grounded. Thus, the Court finds Vizier 50 percent liable for the damages caused to Hooks when the PAT MCDANIEL struck the MIKE HOOKS.

### D. **Eckstein's Third Party Claims Against Longman's**

Eckstein filed a third party claim against Longman's claiming that Longman's was responsible for all or part of Eckstein's liability, if any, toward Hooks. Thus, it is irrelevant that Longman's, owned by Jerrod Longman, breached a contract it had with Hooks, unless that breach constituted a breach of the duty of care which contributed to the accident in this case.

Eckstein argues that Longman's is liable on the ground that the contract between Longman's and Hooks was a charter agreement. As the Court stated in its September 27, 2010 Order & Reasons, Longman's is potentially liable to Hooks if it acted as a charterer. (Rec. Doc. 158 at 5). "[A] time charterer owes a hybrid . . . duty arising from contract and tort, to persons to whom it has no contractual relationship . . . to avoid negligent action within the sphere of activity over which it

exercises at least partial control." *Hogden v. Forest Oil Corp.*, 87 F.3d 1512, 1520 (5th Cir. 1996).

A charter agreement is one between a charterer or shipper, who "obtains the use and service of [a] ship" and a carrier or shipowner, who "suppl[ies] the ship." Thomas J. Shoenbaum, Admiralty & Maritime Law § 11-1, Vol. 2 at 2 (4th ed. 2004). Here, if there was an agreement between Hooks and Longman's, which the Court does not specifically decide, Hooks would have been the charterer because it requested and obtained the use of a picket boat. Third Party Defendant Vizier would have been the shipowner, because it ultimately supplied the boat. None of Longman's involvement in this case persuades the Court that he falls under either the "charterer" or "shipowner" categories. Accordingly, if there was an agreement between Longman's and Hooks, which the Court does not decide, it was not a charter agreement.

Additionally, the Court finds that if an agreement existed, then its terms would have been limited to Longman's receipt of a fee in exchange for connecting Hooks with Rentrop so that Rentrop could provide a picket boat to Hooks. Longman's was not responsible for any deficiencies in the picket boat that Vizier ultimately provided to Hooks. The service he performed cannot be said to have contributed to the accident between Hooks and Eckstein. Thus, he cannot be liable to Eckstein for any of Hooks's claims against Eckstein.

At the time of the incident, Longman, sole owner of Longman's, was employed by Rentrop Tugs, Inc. (Tr. 537). Hooks's employee, Arthur Sonnier called Longman to say that Hooks needed a picket boat. (Tr. 544). Longman could not testify as to how the request was passed along to Vizier, the company that ultimately provided the picket boat. (Tr. 541). However, Hebert's testimony clarifies that Vizier obtained the request from a company called United Tugs, which had obtained the request from Rentrop. (Tr. 541).

Longman knew no details about the picket boat Hooks needed, besides the following three:

(1) Hooks needed a picket boat; (2) the picket boat needed to have 1200 horsepower; and (3) the time and place at which Hooks needed the picket boat. (Tr. 545). Longman's invoices indicate no details as to the characteristics of the picket boat that Rentrop was to provide. (Ex. 30, 31). At most, under "Description" in the invoices, it is indicated "working with dredge mike hooks" or "working with pontoons" or "Picket boat for dredge mike hooks," plus the number of days the job lasted. (*See, e.g.*, Ex. 30 at 4, 6, 12). When asked if he knew any further details besides the three listed above, Longman's stated that all he knew was that Hooks needed a picket boat that would "[w]ork[] as directed." (Tr. 544).

Eckstein argues that Longman knew or should have known the duties of a picket boat, but the Court is unpersuaded. Ashley Kerns, one of Hooks's vice president, indicated in his deposition that when Hooks hires a company to provide a boat, "it's the same specifications each time." (Rec. Doc. 187-1 at 20 (A. Kerns Depo. at 30)). He also stated that "maybe for this particular case Arthur [Sonnier] may not have said, I need this, this, this and this, but they knew that it was the typical picket boat that we needed." (Rec. Doc. 187-1 at 20 (A. Kerns Depo. at 30). However, Longman stated that he could not predict what the picket boat was being used for because "with the dredge company you never know what they are going to be doing in the field." (Tr. 546). Furthermore, he was not charged with providing the actual boat; rather, his service was to refer Hooks's request to Rentrop, a company that supplied boats. Therefore, even if he knew or should have known the qualifications of the picket boat that Hooks needed, it was not his duty to relay that information to Rentrop.

Additionally, Longman's explanation of the invoices convinces the Court what Longman's earned in exchange for his service was a commission taken from the overall fee Rentrop charged Hooks in exchange for Rentrop's service in providing a picket boat. Eckstein provides no legal

support for its argument that Longman's was a charterer, not a mere vessel broker, on the ground that Longman's "is the only party who issued an invoice to Hooks." (Rec. Doc. 320 at 62). This fact is not in dispute, and the invoices clearly show the names of Longman's and Hooks only. (Ex. 30, 31). However, Longman's testified that the total amount in the invoice represents the amount Rentrop was charging Hooks for providing the picket boat, and that Longman kept a "finder's fee" and paid the difference to Rentrop. (Tr. 540). This set-up demonstrates that Longman's was paid solely for connecting Rentrop and Hooks, not for providing a proper vessel to Hooks. Eckstein argues that a finder's fee or commission is "normally" a portion of the amount one party pays to a third party, and that here, there is no third party. (Rec. Doc. 320 at 62). The Court does not find that the absence of a third party affects the legal significance of the amount Longman earned.

Finally, Eckstein points to the fact that Longman's provided Hooks with proof that he was insured for his work, (Tr. 543, Ex. 43), and that this demonstrates that Longman's was more than a vessel broker because "ordinarily" a vessel broker is not required to submit proof of insurance. (Rec. Doc. 320 at 62). As with its argument regarding commissions, Eckstein provides no authority in support for this argument, and it fails to rebut the strong evidence that Longman was hired merely as a broker.

Eckstein also claims that Longman's breached the warranty of workmanlike performance it owed to Hooks. However, this claim fails, even if a contract existed between Hooks and Longman's. The warranty arises only if the putative warrantor is "performing some type of service for the party asserting the warranty claim." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1212 (5th Cir. 1986). As stated earlier, Longman's service was limited to referring Hooks to a company that would provide it with a picket boat. He knew no details about the picket boat itself that Hooks needed, and he had no control over which boat Hooks ultimately hired. Therefore, the warranty of

workmanlike performance does not apply here. Thus, the Court finds that Longman's is not liable at all for any claims Hooks could have brought against it.

## III. CONCLUSION

IT IS ORDERED that Plaintiff Mike Hooks Dredging Co., Inc. is liable for 70 percent of the damages.

IT IS FURTHER ORDERED that Defendant Eckstein Marine Service, Inc. is liable for 30 percent of the damages.

IT IS FURTHER ORDERED that Third Party Defendant Tommie Vizier Towing Company, Inc. is 50 percent liable for Hooks's claims against Eckstein. Accordingly, Eckstein is liable for a total of 15 percent of the damages and Vizier is liable for a total of 15 percent of the damages.

IT IS FURTHER ORDERED that Third Party Plaintiff Eckstein Marine Service, Inc.'s claims against Third Party Defendant Longman's Marine Service, Inc., are DISMISSED.

New Orleans, Louisiana, this 28th day of March, 2012.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**